No. 120,544

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JERRY STRICKERT,
*Appellant*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellee*.

SYLLABUS BY THE COURT

1.

K.S.A. 2019 Supp. 8-259(a) requires the district court to review an agency's decision to suspend a driver's license by trial de novo to the court.

2.

An appellate court reviews a district court's decision in a driver's license suspension case to determine whether it is supported by substantial competent evidence. Substantial competent evidence is legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion.

3.

A routine traffic stop is a seizure within the meaning of the Fourth Amendment to the United States Constitution; therefore, to comply with its strictures, the officer conducting the stop must have a reasonable and articulable suspicion that the driver has committed, is committing, or is about to commit a crime. Courts evaluate the existence of a reasonable suspicion under a totality of the circumstances analysis that requires a case-by-case assessment.

## 4.

A traffic infraction provides police with the reasonable suspicion necessary to initiate a traffic stop. The scope and duration of a stop must be strictly tied to and justified by the circumstances that rendered it proper and must last no longer than is necessary to effectuate the purpose of the stop. To extend a traffic stop beyond the time necessary to address the traffic violation, an officer must have a reasonable suspicion to believe that the person was or is involved in additional criminal activity. Reasonable suspicion requires more than just a hunch; the officer must be able to state a particularized and objective basis for believing the person stopped is engaged in criminal activity.

## 5.

Suspension of a driver's license is proper if (1) the law enforcement officer had reasonable grounds to believe the driver operated a vehicle while under the influence of alcohol, (2) the driver was arrested for an alcohol-related offense and there was probable cause to effectuate that arrest, (3) the driver was presented with the required oral and written notices, and (4) the driver refused to submit to the requested breath test.

## 6.

Probable cause is the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime. In the context of the driver's license suspension statute, the reasonable grounds standard is essentially the same as the probable cause standard.

## 7.

In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it.

Appellate courts are expected to give deference to the fact-finder who was in the courtroom when the testimony was given and where the inferences from the facts were reached.

Appeal from Finney District Court; RICKLIN R. PIERCE, judge. Opinion filed March 13, 2020. Affirmed.

*John M. Lindner*, of Lindner, Marquez & Koksal, of Garden City, for appellant.

*John D. Shultz*, of Legal Services Bureau, Kansas Department of Revenue, for appellee.

Before STANDRIDGE, P.J., LEBEN and BRUNS, JJ.

STANDRIDGE, J.:  Following an administrative hearing, the Kansas Department of Revenue (KDR) suspended Jerry Strickert's driving privileges after finding that he refused to submit to a breath test on August 28, 2017. Strickert filed a petition with the district court seeking review of that administrative decision. After conducting a de novo bench trial, the district court upheld the administrative suspension. On appeal, Strickert challenges the district court's findings regarding the lawfulness of the initial stop, the extension of the initial stop, his arrest, and the request that he submit to an evidentiary breath test. Finding no error, we affirm the district court's decision.

FACTS

On August 28, 2017, a little before 1 a.m., Strickert left Rosie's Bar in Garden City, Kansas. As he drove away, Strickert noticed that he was being followed by two Garden City Police officers. As he turned west, Strickert observed one of the officers pull over a different vehicle behind him. The second officer, who later was identified as Officer Joshua Meinzer, continued to follow Strickert. After signaling, Strickert turned right onto Walker Street. His intent was to continue traveling eastbound on Walker Street

3

but ultimately was unable to because Walker Street dead-ends into Taylor Avenue. Strickert, who later said he was unfamiliar with the area, did not realize that he could not continue straight on Walker Street until he reached the T-intersection. Strickert stopped at the stop sign that controlled the intersection and decided to turn left (northbound) onto Taylor Avenue. He signaled his intent to do so while still stopped at the stop sign and then began to make the turn. At this point, Officer Meinzer initiated a traffic stop by activating his overhead emergency lights.

After Strickert pulled over, Officer Meinzer exited his patrol vehicle and made contact with him through the driver's side window. Officer Meinzer asked Strickert for his license, registration, and proof of insurance. Strickert, who recently had moved back to Kansas after living out of state for 10 years, produced a valid Texas driver's license but was unable to provide a physical copy of his current proof of insurance. There also was some confusion about what constituted a valid vehicle registration. Strickert indicated that the sticker on his windshield was sufficient proof of vehicle registration in Texas but Officer Meinzer insisted that the sticker was insufficient in Kansas. Throughout this interaction, Officer Meinzer noticed the odor of alcohol around Strickert and also observed that his eyes were bloodshot and his speech was slow. Based on those observations, Officer Meinzer asked Strickert if he had consumed any alcohol that night and Strickert admitted to drinking one beer.

At this point, Officer Meinzer instructed Strickert to get out of the vehicle and place his hands on top of his head to be patted down for officer safety. Strickert began to comply but, as he raised his hands, he realized that he was still holding his car keys. Wanting to "secure them" before doing anything else, Strickert dropped his hands and put his keys in his pocket. He then raised his hands again and began to place them on top of his vehicle before quickly correcting himself and placing them on top of his head. Once Strickert was cleared by the pat-down, Officer Meinzer moved him a short distance away from his vehicle and prepared him for a number of field sobriety tests. Strickert told

4

Officer Meinzer—without being prompted or asked—that he was exposed to improvised explosive devices while deployed as a Marine in Afghanistan and, as a result, suffered from a loss of mobility in his lower right extremity as well as a loss of hearing. Both conditions, he later said, affected his performance on the field sobriety tests. He also later claimed that his performance was affected by the flip-flops that he was wearing because they "can play a part in the balance or hanging up on the asphalt."

The first test administered by Officer Meinzer was the walk-and-turn test. The test was conducted on a surface that was free from debris and relatively flat but did have a slight downhill slope towards the roadway. Officer Meinzer demonstrated the test and then gave Strickert instructions about how to complete it. As he was doing so, Strickert got into the starting position but came out of it when Officer Meinzer told him not to start yet. When Officer Meinzer finished giving his instructions, Strickert got back into the starting position and walked nine steps heel-to-toe. At this point, Strickert asked Officer Meinzer either when or in which direction he was supposed to turn. Officer Meinzer did not respond to the question so Strickert completed the turn and took nine steps back to his starting position. Officer Meinzer detected four clues of impairment during the walk-and-turn test: (1) failing to maintain balance in the instruction position; (2) stopping and asking for clarification of the instructions after taking the first nine steps instead of completing the test in one continuous motion; (3) making an improper turn by "lifting both feet off the ground, which was inconsistent with the demonstration that was provided"; and (4) failing to maintain the heel-to-toe style of walking during the second set of nine steps.

The second test administered by Officer Meinzer was the one-leg-stand test. For this test, Strickert was instructed to stand on one leg for a set period of time. Strickert chose to stand on his left leg and raise his injured/disabled right leg into the air until he was told to put it down. Officer Meinzer claimed to detect one clue of impairment during the one-leg-stand test but failed to specify what the clue was.

The third test administered by Officer Meinzer is known as the Rhomberg test. Officer Meinzer instructed Strickert to tip his head back, close his eyes, and count to 30 by thousands (as in one, one thousand; two, one thousand, etc.) for an estimated 30 seconds. Officer Meinzer told Strickert that when he was done, he should bring his head forward and say stop. Strickert completed the test, and Officer Meinzer detected two clues of impairment: (1) swaying from side-to-side during the test and (2) continuing the test for 45 seconds when told to stop after an estimated 30 seconds.

After completing the field sobriety tests, Officer Meinzer offered Strickert the opportunity to take a preliminary breath test (PBT), but Strickert refused. Strickert later said he refused the PBT because he felt like Officer Meinzer had determined from the moment the traffic stop was initiated that he was driving while under the influence (DUI) of alcohol. Strickert said he was not going to allow his rights to be further infringed by submitting to a PBT. Based on the clues of impairment during the interaction and the field sobriety tests, as well as Strickert's refusal to submit to a PBT, Officer Meinzer arrested Strickert. Officer Meinzer later asked Strickert to submit to an evidentiary breath test, but he refused. Officer Meinzer filled out a DC-27 form, citing the odor of alcoholic beverages, failed sobriety tests, bloodshot eyes, poor balance or coordination, and Strickert's admission that he had consumed alcohol as reasonable grounds for his belief that Strickert was driving under the influence. Officer Meinzer did not check the boxes for "slurred speech" and "difficulty in communication" on the DC-27 form.

Strickert was served with a Notice of Driver's License Suspension on August 28, 2017. He submitted a timely response through counsel and requested an in-person administrative hearing, which was held on October 27, 2017. After hearing witness testimony and watching the dash cam video, the hearing officer affirmed the administrative action to suspend and restrict Strickert's driving privileges. Strickert petitioned the district court for review, and a de novo bench trial was held on June 28, 2018. Like the hearing officer, the district court heard testimony from both Strickert and

6

Officer Meinzer and watched the dash cam video. And like the hearing officer, the district court denied Strickert's petition and affirmed the administrative suspension of his license.

STANDARD OF REVIEW

When reviewing a district court's order in an administrative driver's license suspension case, appellate courts generally "are tasked with ascertaining whether substantial competent evidence in the record supported the district court's findings and whether the conclusion derived from those findings is legally correct." *Casper v. Kansas Dept. of Revenue*, 309 Kan. 1211, 1213, 442 P.3d 1038 (2019); see also *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012) ("An appellate court generally reviews a district court's decision in a driver's license suspension case to determine whether it is supported by substantial competent evidence."). Substantial competent evidence is legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). But in reviewing a district court's factual findings, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

In its brief, the KDR suggests that the appropriate standard of review is not the substantial competent evidence standard but rather the negative finding standard. Specifically, the KDR submits that K.S.A. 77-621(c), the portion of the Kansas Judicial Review Act (KJRA) that defines the scope of review for agency actions, only applies to district courts; therefore, the district court's finding that Strickert failed to carry his burden of proof requires the application of the negative finding standard of review. But K.S.A. 77-621(c) only applies to the extent that the [KJRA] or another statute does not provide otherwise. K.S.A. 77-621(a); see *Zurawski v. Kansas Dept. of Revenue*, 18 Kan. App. 2d 325, 327, 851 P.2d 1385 (1993). In driver's license suspension cases, K.S.A.

7

2019 Supp. 8-259(a) provides that review at the district court "shall be by trial de novo to the court." We find no cases, and the KDR fails to cite to any, that applies the negative finding standard of review to appeals in driver's license suspension cases. By contrast, Kansas caselaw is replete with examples of courts, including the Kansas Supreme Court, applying the substantial competent evidence standard to driver's license suspension cases. See, e.g., *Drake v. Kansas Dept. of Revenue*, 272 Kan. 231, 233-34, 32 P.3d 705 (2001) (approving substantial competent evidence standard used by appellate courts after noting that K.S.A. 77-623 requires decisions on petitions for review of agency actions to be reviewable as in other civil cases); *Swank*, 294 Kan. at 881. Accordingly, we apply the substantial competent evidence standard of review to Strickert's first issue on appeal.

ANALYSIS

On appeal, Strickert claims the district court erred when it found (1) the officer had reasonable suspicion to initially detain him for a traffic infraction and to extend the detention for a DUI investigation and (2) the officer had reasonable grounds to arrest him and request him to submit to an evidentiary breath test. We address each of Strickert's claims in turn.

1. *Reasonable suspicion*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). A routine traffic stop is a seizure within the meaning of the Fourth Amendment; therefore, to comply with its strictures, the officer conducting the stop must have a reasonable and articulable suspicion that the

8

driver has committed, is committing, or is about to commit a crime. K.S.A. 22-2402(1); see *State v. Glover*, 308 Kan. 590, Syl. ¶ 1, 422 P.3d 64 (2018), *cert. granted* 139 S. Ct. 1445 (2019). "Courts evaluate the existence of a reasonable suspicion under a totality-of-the-circumstances analysis that requires a case-by-case assessment." 308 Kan. 590, Syl. ¶ 2.

Observation of a traffic violation, even if it is a mere pretext, provides an officer with the requisite reasonable suspicion and is an objectively valid reason to initiate a stop. *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). The scope and duration of the stop, however, must be strictly tied to and justified by the circumstances that rendered it proper and must last no longer than is necessary to effectuate the purpose of the stop (i.e., the traffic violation). *State v. Jimenez*, 308 Kan. 315, 322, 420 P.3d 464 (2018). To extend a traffic stop beyond the time necessary to address the traffic violation, an officer must have a reasonable suspicion to believe that the person was or is involved in additional criminal activity. *Jones*, 300 Kan. 630, Syl. ¶ 6; *State v. Pollman*, 286 Kan. 881, Syl. ¶¶ 3-5, 190 P.3d 234 (2008). Reasonable suspicion requires more than just a hunch; the officer must be able to state a particularized and objective basis for believing the person stopped is engaged in criminal activity. *State v. Lowery*, 308 Kan. 359, 366, 420 P.3d 456 (2018).

a. *The initial stop*

Strickert claims that Officer Meinzer lacked the reasonable suspicion necessary to initiate the traffic stop. A traffic infraction provides police with the level of suspicion necessary to initiate a traffic stop. This is true even if the traffic violation is mere pretext for the stop. *State v. Golston*, 41 Kan. App. 2d 444, 450, 203 P.3d 10 (2009).

Officer Meinzer testified that he initiated the traffic stop after seeing Strickert fail to properly signal before making a turn on two separate occasions, which are traffic violations under K.S.A. 8-1548. That statute provides, in relevant part:

"(a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner herein provided.

"(b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." K.S.A. 8-1548.

Strickert acknowledges that waiting until he was stopped at the T-intersection of Walker Street and Taylor Avenue to activate his turn signal constitutes a failure to appropriately indicate his intention to turn at least 100 feet before doing so. But he argues that a common-sense reading of K.S.A. 8-1548 indicates that the Legislature intended the 100-feet rule set forth in the statute to apply only to vehicles that are in motion and not to vehicles that are stopped at a controlled intersection. He also argues he did not intend to turn until he came to a complete stop at the intersection; he wanted to continue traveling east but was unfamiliar with the area and did not realize that he would have to turn until he was already stopped.

The Kansas Supreme Court already has considered and rejected Strickert's arguments in *State v. Greever*, 286 Kan. 124, 138-41, 183 P.3d 788 (2008), a case with facts almost identical to the ones presented here. There, Greever failed to signal his intention to turn until after coming to a complete stop at a T-intersection. A law enforcement officer initiated a traffic stop, and Greever ultimately was arrested for possession of marijuana. Greever later moved to suppress the evidence that was seized during the traffic stop on grounds that the officer lacked the reasonable suspicion necessary to initiate the stop. The district court denied Greever's motion and that decision was affirmed by the Kansas Supreme Court. 286 Kan. at 141. The court held that the

10

plain language of K.S.A. 8-1548 does not provide for any exceptions to the requirement that a driver signal his or her intention to turn not less than 100 feet before turning. The court noted the statute does not require that the driver possess a particular criminal intent in order to be found guilty of the traffic infraction; instead, the infraction is an absolute liability offense, meaning no criminal intent is required, and the only proof necessary for a conviction is that the individual engaged in the prohibited conduct. 286 Kan. at 138. The court concluded that the traffic stop was valid because "[i]t [was] clear from the evidence that Greever failed to give the warning proscribed by K.S.A. 8-1548." 286 Kan. at 140.

The Kansas Court of Appeals is duty-bound to follow Kansas Supreme Court precedent, absent some indication that the Kansas Supreme Court is departing from its previous position. *Tillman v. Goodpasture*, 56 Kan. App. 2d 65, 77, 424 P.3d 540 (2018), *rev. granted* 309 Kan. 1354 (2019). There is no indication that the Kansas Supreme Court is departing from the position set forth in *Greever*. Accordingly, we find substantial competent evidence in the record to support the district court's finding that Officer Meinzer had the reasonable suspicion necessary to initiate a traffic stop after he observed Strickert violate K.S.A. 8-1548(b) by failing to activate his turn signal until after he came to a complete stop at the T-intersection of Walker and Taylor. See *Greever*, 286 Kan. at 140.

b. *Extending the stop*

Strickert argues that, even if the initial stop was justified, Officer Meinzer lacked the reasonable suspicion necessary to extend the stop for purposes of conducting a DUI investigation.

When an officer initiates a stop based on a traffic infraction, the scope of the stop is limited so that the officer may only "request a driver's license and vehicle registration,

11

run a computer check, and issue a citation." *Golston*, 41 Kan. App. 2d at 451. Once the officer has completed those routine tasks, "the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer," unless the officer has reasonable and articulable suspicion that the driver has, is, or is going to engage in some other illegal activity. 41 Kan. App. 2d at 451. In that case, the detention may be extended while the officer investigates his or her suspicions. 41 Kan. App. 2d at 451.

In support of his argument that Officer Meinzer did not have the reasonable suspicion necessary to extend the stop for purposes of conducting a DUI investigation, Strickert cites to *City of Hutchinson v. Davenport*, 30 Kan. App. 2d 1097, 1101, 54 P.3d 532 (2002). In that case, a panel of this court held that the odor of alcohol alone does not give an officer reasonable suspicion to stop a vehicle. 30 Kan. App. 2d at 1101. But the legal and factual issues presented here are distinguishable from those presented in *Davenport*. First, the legal issue presented in *Davenport* was whether an officer's initial stop can be justified by nothing more than the odor of alcohol on the driver's breath. 30 Kan. App. 2d at 1098. By contrast, we already have found that the initial stop in this case was valid based on the traffic infraction committed by Strickert and are now presented with the issue of whether Officer Meinzer had the reasonable suspicion necessary to extend the stop in order to investigate the crime of DUI. Second, the officer in *Davenport* relied only on the odor of alcohol to support reasonable suspicion. In this case, Officer Meinzer relied on the odor of alcohol as well as Strickert's watery and bloodshot eyes, admission to consuming alcohol, and his commission of a traffic infraction.

We find *Davenport* provides little to no support for Strickert's argument. Instead, the facts of this case are more analogous to *Pollman*, which Strickert cites to as a case on the other end of the spectrum. There, an officer "seized" a motorist within the meaning of the Fourth Amendment after the motorist allegedly obstructed the officer's performance of an official duty. *Pollman*, 286 Kan. at 883-84, 888-89, 891-92. The officer then extended that seizure to conduct a DUI investigation based on the motorist's admission to

12

drinking a few beers and the officer's detection of the odor of alcohol. The Kansas Supreme Court ultimately upheld extension of the seizure, concluding:

"[T]he totality of the circumstances—including criminal obstruction of official duty, admission to drinking, and smell of alcohol—provided reasonable suspicion to justify an investigation into whether [the motorist] . . . was operating his motorcycle while under the influence of alcohol. In other words, there existed a minimum level of objective justification sufficient for the investigative detention of [the motorist]." 286 Kan. at 897.

In this case, we similarly find that Officer Meinzer's extension of the traffic stop for purposes of conducting a DUI investigation was justified by the totality of the circumstances: (1) his observation of a traffic infraction, (2) the odor of alcohol coming from Strickert's person, (3) Strickert's watery and bloodshot eyes, and (4) Strickert's admission to consuming alcohol. See 286 Kan. at 897.

2. *Reasonable grounds*

Strickert argues that Officer Meinzer did not have reasonable grounds to believe he was driving under the influence and therefore did not have probable cause to arrest him. In the absence of probable cause to arrest him, Strickert argues his refusal to submit to the evidentiary breath test did not warrant suspension of his driving privileges.

There is no dispute here that Strickert refused to submit to an evidentiary breath test after his arrest. Under K.S.A. 2019 Supp. 8-1002(a)(1), the KDR may suspend a person's driving privileges upon refusal to submit to a validly requested evidentiary test when the following four conditions are met:

"(A) There existed reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol . . . ; (B) the person had been placed under arrest, was in custody or had been involved in a vehicle accident or

collision; (C) a law enforcement officer had presented the person with the oral and written notice required by K.S.A. 8-1001, and amendments thereto; and (D) the person refused to submit to and complete a test as requested by the law enforcement officer."

The arrest referenced in subsection (B) must be lawful, i.e., supported by probable cause, in order to satisfy that element. *Casper*, 309 Kan. at 1214-15; see *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 19, 290 P.3d 555 (2012). Probable cause is a higher standard than reasonable suspicion and is defined as "the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime." *State v. Johnson*, 297 Kan. 210, 222, 301 P.3d 287 (2013). Although not identical, the reasonable grounds standard set forth in subsection (A) has been held to be essentially the same as the probable cause standard set forth in subsection (B). *Casper*, 309 Kan. at 1215 (citing *Johnson*, 297 Kan. at 222). Accordingly, if an officer lacks reasonable grounds to believe that a person is driving under the influence, then the officer also lacks probable cause to lawfully arrest that person. 309 Kan. at 1215.

In support of his argument that Officer Meinzer lacked reasonable grounds to believe that he was driving under the influence and lacked probable cause to arrest him, Strickert relies on *City of Wichita v. Molitor*, 301 Kan. 251, 266-67, 341 P.3d 1275 (2015), and *Casper*.

In *Molitor*, the Kansas Supreme Court held that an officer lacked reasonable suspicion to believe that Molitor was operating a vehicle under the influence of alcohol, which is a necessary precondition before an officer can request a PBT. "'Reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause.'" 301 Kan. at 257-58. Strickert compares the factors of impairment and nonimpairment presented in *Molitor* to the factors of impairment and nonimpairment presented here to support his argument that Officer Meinzer did not have reasonable

14

grounds to believe he was driving under the influence. But both the facts and the legal issue presented in *Molitor* are distinguishable from those presented here. In *Molitor*, the legal issue decided by the court was whether the officer "possessed the requisite reasonable suspicion that Molitor was operating his vehicle while under the influence of alcohol when the officer requested that Molitor submit to a PBT." 301 Kan. at 268-69. In this case, however, the legal issue as framed by Strickert is whether Officer Meinzer had *reasonable grounds* that he was operating his vehicle while under the influence when the officer *arrested him* and requested him to submit to an *evidentiary breath test*. One of the facts considered by the district court in deciding that the officer did have reasonable grounds to arrest Strickert and to ask Strickert to submit to an evidentiary breath test was evidence in the record that reflects Strickert refused the officer's request that Strickert submit to a PBT. And although Strickert argues in his brief that we should not consider his refusal to take the PBT, he does so on grounds that an officer's request to submit to a PBT is not accompanied by a statutory warning that a refusal may be used against the subject in future proceedings.

Strickert also cites to the Kansas Supreme Court's recent decision in *Casper* to support his position. In that case, the Supreme Court found substantial competent evidence supported the district court's factual findings that the officer did not have reasonable grounds to believe that the driver was operating her vehicle while impaired and that the officer did not have probable cause to arrest the driver. 309 Kan. at 1221. Strickert argues that because there was more evidence supporting reasonable grounds of DUI in the *Casper* case than in this case, we necessarily must come to the same conclusion: that the officer did not have reasonable grounds to believe *he* was driving under the influence. But adopting Strickert's argument requires us to compare the number of factors that supports a finding of reasonable grounds in one case to the number of factors that support a finding of reasonable grounds in this case. This type of case-to-case comparison is directly at odds with the legal holding in *Casper*, which requires the reviewing court to determine whether "substantial competent evidence in the record

15

supported the district court's factual findings and whether the conclusion derived from those findings is legally correct." 309 Kan. at 1213. In making that determination, the *Casper* court found it "necessary to look to the evidence before the district court and how the district court considered that evidence." 309 Kan. at 1216. Accordingly, we turn to the proceedings before the district court here.

On June 28, 2018, the district court held a trial. Both Strickert and Officer Meinzer testified. The video dash cam from Officer Meinzer's police vehicle and the DC-27 form were introduced into evidence. The court allowed both parties to present trial briefs to the court. On August 17, 2018, the district court issued written findings of fact and conclusions of law in the form of a 17-page journal entry, which affirmed the decision of the KDR to suspend Strickert's driver's license. Relevant here, the court made the following findings of fact in its Journal Entry:

- Officer Meinzer followed Strickert's vehicle as Strickert drove away from a bar at approximately 1 a.m.
- Strickert failed to properly signal his intent to turn 100 feet before turning.
- Officer Meinzer smelled the odor of alcohol coming from Strickert.
- Strickert was the only occupant of the vehicle.
- Strickert admitted to consuming alcohol.
- Officer Meinzer noticed Strickert's eyes were bloodshot and watery.
- Officer Meinzer noticed Strickert's speech was slow.
- Officer Meinzer did not mark the slurred speech box on the form DC-27.
- When Officer Meinzer directed Strickert out of the vehicle to conduct an officer safety pat-down search, Strickert did not follow Officer Meinzer's directions.
- Officer Meinzer did not ask Strickert if he had any physical impairments, and there was no evidence that Strickert informed Officer Meinzer that he had physical impairments.

16

- Strickert performed the requested field sobriety tests on a flat concrete surface.

- Strickert exhibited four clues of impairment on the walk-and-turn test: failed to maintain balance, stopped after nine steps and asked about the turn, turned improperly, and missed heel to toe on the returning nine steps.

- The video reflected that Strickert lost his balance twice during instructions and started before instructions were completed.

- The video reflected that Strickert was not following instructions from Officer Meinzer during the walk-and-turn test.

- Strickert performed the one-leg-stand with one clue of impairment: swaying.

- Strickert finished the Rhomberg test in approximately 45 seconds instead of 30 seconds and swayed left to right while he was performing the test.

- Strickert refused to submit to a PBT.

- Strickert was arrested and refused to submit to an evidentiary breath test.

- Strickert testified he did not take the PBT and the evidentiary breath test because he believed Officer Meinzer already had assumed Strickert was under the influence of alcohol.

- There was no evidence of any unprofessional conduct of the officer or threats or coercion by Officer Meinzer; this was not a situation where Officer Meinzer knew Strickert from a previous encounter or situation.

With the exception of the court's finding that there was no evidence of Strickert informing Officer Meinzer that he had physical impairments, each of these factual findings is supported by substantial competent evidence in the record. As to Strickert informing Officer Meinzer that he had physical impairments, the following exchange occurred between the KDR's attorney John Shultz and Officer Meinzer during direct testimony at trial:

17

"Q. Now, during the time that you witnessed Mr. Strickert walk, did he indicate to you or did you notice that he had any kind of physical impairment?

"A. I didn't notice one, but he had indicated one to me.

"Q. Okay. He told you that?

"A. Yes."

The fact that this particular finding is not supported by the record, however, is of no consequence to this appeal. This is because the district court makes clear that it did not rely on this particular fact in making its final decision:

"47. To recap, the officer had the following to support his belief as to probable cause to arrest, to wit: admitted consumption of alcohol, odor of alcohol emanating from [Strickert], bloodshot and watery eyes, slow speech, failure to follow instructions to place hands on head, clear failure to perform the walk and turn test, unsuccessful completion of the Rhomberg test, and refusal to submit to the [PBT].

"48. On the other hand, [Strickert] stated that he had only one beer, successfully passed the one-leg-stand test, had no impaired driving, did not have any trouble exiting the vehicle, and had no slurred speech.

"49. Based upon the totality of the circumstances, the officer did have probable cause to arrest [Strickert] and therefore had reasonable grounds to request that [Strickert] submit to an evidentiary breath test."

"'In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it.'" *Casper*, 309 Kan. at 1220. As the analysis above demonstrates, the district court heard testimony, reviewed the video, weighed the evidence, and made a decision based on the totality of the circumstances. As specifically set forth in *Casper*, "appellate courts are expected to give deference to the fact-finder who was in the courtroom when the testimony was given and where the inferences from the facts were reached." 309 Kan. at

18

1221. We find that substantial competent evidence supports the district court's factual findings and that those findings support the court's legal conclusion: that Officer Meinzer had reasonable grounds to believe Strickert was driving under the influence, that Officer Meinzer had probable cause to arrest Strickert for DUI, that Officer Meinzer presented Strickert with the oral and written notices required by the implied consent law, and that Strickert refused to submit to and complete an evidentiary breath test as requested by Officer Meinzer. The district court's decision to affirm the KDR's decision to suspend Strickert's driver's license is affirmed.

Affirmed.